UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

RICHARD LIEBMAN,

                Plaintiff,

      vs.

LADENBURG THALMANN FINANCIAL
SERVICES INC., HENRY C. BEINSTEIN,
GLENN C. DAVIS, BRIAN S. GENSON,
RICHARD M. KRASNO, RICHARD J.
LAMPEN, MICHAEL S. LIEBOWITZ,
HOWARD M. LORBER, JACQUELINE M.
SIMKIN, MARK ZEITCHICK, and ADAM
MALAMED,

                Defendants.

------------------------------------------------------------

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No._____

**COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

Plaintiff Richard Liebman ("Plaintiff"), upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Complaint:

## NATURE AND SUMMARY OF THE ACTION

1.     This action is brought by Plaintiff against Ladenburg Thalmann Financial Services Inc. ("Ladenburg" or the "Company") and the members of Ladenburg's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Ladenburg will be acquired by Advisor

Group Holdings, Inc. ("Advisor Group") through its wholly owned subsidiary Harvest Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On November 11, 2019, Ladenburg and Advisor Group issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated November 11, 2019 (the "Merger Agreement") to sell Ladenburg to Advisor Group.  Under the terms of the Merger Agreement, each Ladenburg stockholder will receive $3.50 in cash for each share of Ladenburg common stock they own (the "Merger Consideration").  The Proposed Transaction has a total enterprise value of $1.3 billion, taking into account Ladenburg's common stock, preferred stock and outstanding debt.

3.      On December 6, 2019, Ladenburg filed a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Ladenburg stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the sale process leading to the Proposed Transaction; (ii) Ladenburg management's financial projections, relied upon by Ladenburg's financial advisor, Jefferies LLC ("Jefferies"), in its financial analyses; (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Jefferies; and (iv) potential conflicts of interest faced by Ladenburg insiders.  Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In short, unless remedied, Ladenburg's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making a sufficiently informed voting decision on the Proposed Transaction.  Plaintiff seeks

to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants are found or are inhabitants or transact business in this District.  Ladenburg's common stock trades on the NYSE American, which is headquartered in this District, rendering venue in this District appropriate.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Ladenburg.

9.     Defendant Ladenburg is a Florida corporation with its principal executive offices located at 440 Biscayne Boulevard, 12th Floor, Miami, Florida 33137.  Ladenburg is a diversified financial services company whose subsidiaries include industry-leading independent advisory and brokerage ("IAB") firms Securities America, Triad Advisors ("Triad"), Securities Service Network ("SSN"), Investacorp, KMS Financial Services ("KMS"), Ladenburg Thalmann & Co., Ladenburg Thalmann Asset Management ("LTAM"), Premier Trust, and Highland Capital

Brokerage ("Highland"), a leading independent life insurance brokerage company and full-service annuity processing and marketing company.  The Company's common stock is listed on the NYSE American under the ticker symbol "LTS."

10.     Defendant Henry C. Beinstein ("Beinstein") has been a director of the Company since 2001.

11.     Defendant Glenn C. Davis ("Davis") has been a director of the Company since 2018.

12.     Defendant Brian S. Genson ("Genson") has been a director of the Company since 2004.

13.     Defendant Richard M. Krasno ("Krasno") has been a director of the Company since 2006 and the Company's Lead Independent Director since 2014.

14.     Defendant Richard J. Lampen ("Lampen") has been the Company's Chief Executive Officer ("CEO") and President since September 2006, Chairman of the Board since September 2018 and a director of the Company since 2002.

15.     Defendant Michael S. Liebowitz (Liebowitz) has been a director of the Company since 2019.

16.     Defendant Howard M. Lorber ("Lorber") has been a director of the Company since 2001.

17.     Defendant Jacqueline M. Simkin ("Simkin") has been a director of the Company since 2011.

18.     Defendant Mark Zeitchick ("Zeitchick") is Executive Vice President and has been a director of the Company since 1999.

19.     Defendant Adam Malamed ("Malamed") is Executive Vice President, Chief Financial Officer and has been a director of the Company since 2018.

20.     Defendants identified in paragraphs 10-19 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

21.     Advisor Group is a Delaware corporation with its principal executive offices located at 2800 N. Central Avenue, Suite 2100, Phoenix, AZ 85004.  Advisor Group is one of the nation's largest networks of independent financial advisors serving over 7,000 advisors and overseeing $271 billion in client assets.  Advisor Group offers securities and investment advisory services through its subsidiaries FSC Securities Corp., Royal Alliance Associates Inc., SagePoint Financial, Inc. and Woodbury Financial Services, Inc., as broker/dealers, registered investment advisors and members of FINRA and SIPC.

22.     Merger Sub is a Florida corporation and a wholly-owned subsidiary of Advisor Group.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

23.     Ladenburg is a diversified financial services company engaged in independent advisory and brokerage services, asset management services, investment research, investment banking, institutional sales and trading, wholesale life insurance and annuity brokerage and trust services through its principal subsidiaries, Securities America, Triad, SSN, Investacorp, KMS, Ladenburg Thalmann & Co., LTAM, Premier Trust, and Highland.

24.     Through its acquisitions of Securities America, Triad, SSN, Investacorp and KMS, Ladenburg has established a leadership position in the independent advisory and brokerage services industry, one of the fastest growing segments of the financial services industry over the

past decade.  With approximately 4,400 financial advisors located in 50 states, Ladenburg has become one of the largest independent advisory and brokerage services networks.

25.    The Company has three operating segments: (i) the independent advisory and brokerage services segment; (ii) the Ladenburg segment; and (iii) the insurance brokerage segment.  The independent advisory and brokerage services segment includes the investment advisory and brokerage services provided by Ladenburg's independent advisory and brokerage subsidiaries to their independent contractor financial advisors and the wealth management services provided by Premier Trust.  The Ladenburg segment includes the investment banking, sales and trading and asset management services and investment activities conducted by Ladenburg and LTAM.  The insurance brokerage segment includes the wholesale insurance brokerage activities provided by Highland, which delivers life insurance, fixed and equity indexed annuities and long-term care solutions to investment and insurance providers, and provides marketing strategies, product expertise, and back-office processing for fixed and equity-indexed annuities.

26.    On May 9, 2019, the Company announced its first quarter 2019 ("1Q19") financial results, including: (i) revenues of $335.5 million, a 1.8% increase from revenues of $329.4 million in the first quarter of 2018 ("1Q18"); (ii) commissions revenue increase of 2.2% to $166.9 million from $163.3 million in 1Q18; (iii) service fees revenue increase of 29.3% to $32.2 million from $24.9 million for 1Q18; (iv) EBITDA of $20.4 million, an increase of 1.1% from $20.2 million in 1Q18; and (v) total client assets under administration of $172.6 billion, a 3.8% increase from $166.2 billion at March 31, 2018.  In the press release, defendant Malamed was quoted as stating:

> We made good progress during the first quarter of 2019 on the continued growth of our nationwide network of over 4,400 independent financial advisors, reflecting our successful recruiting of talented advisors over the past three years. Our advisory assets under management at March 31, 2019 were a record $81.1 billion, up 10.2% from $73.6 billion at March 31, 2018 and up 11.5% from $72.8 billion at December 31, 2018. As we look forward to the remainder of 2019, we will continue to invest

for both near and long-term opportunities to grow our recurring revenues, while being keenly focused on increasing shared services and our operational efficiencies and managing expenses. This is all done to further drive margin and profitability improvements across the enterprise while making strategic investments to create value for our employees, financial advisors and shareholders.

27.     On August 8, 2019, the Company announced its second quarter 2019 financial results ("2Q19"), including: (i) revenues of $363.6 million, a 1.6% increase from revenues of $357.8 million in the second quarter of 2018 ("2Q18"); (ii) advisory fee revenue increase of 2.7% to $126.0 million from $122.6 million for 2Q18; (iii) service fees revenue increase of 17.4% to $32.4 million from $27.6 million for 2Q18; (iv) EBITDA of $26.7 million, an increase of 3.3% from $25.8 million in 2Q18; and (v) total client assets under administration of $177.7 billion, a 12.0% increase from $168.0 billion at June 30, 2018.

28.     In the 2Q19 press release, defendant Lampen commented on the successful quarter, stating:

> We are pleased with our robust second quarter 2019 results, including growth in client assets to a record $177.7 billion and continued strong operating financial performance. Our independent advisory and brokerage firms and capital markets business performed well during the quarter. Our investment banking pipeline is solid, and the increased levels of capital markets activity have continued into the third quarter. Investment banking revenue has rebounded since the temporary U.S. government shutdown during the first quarter. We remain focused on continuing our growth and returning capital to shareholders, as appropriate.

Defendant Malamed also touted the Company's success, stating:

> We made solid progress on the continued growth of our nationwide network of independent financial advisors during the first half of 2019, reflecting our successful recruiting efforts over the past three years. Our advisory assets under management at June 30, 2019 were a record $85.7 billion, up 14.0% from $75.2 billion at June 30, 2018 and up 17.8% from $72.8 billion at December 31, 2018. As we look ahead to the remainder of 2019, we will continue to invest in opportunities to grow recurring revenues, while continuing to manage expenses through shared services and operational efficiencies. Our ultimate goal is to further drive margin and profitability improvements across the enterprise while making strategic investments to create value for our employees, financial advisors and shareholders.

29.    On November 8, 2019, the Company announced its third quarter 2019 ("3Q19") financial results, including: (i) revenues of $374.5 million, a 7.4% increase from revenues of $348.9 million in the third quarter of 2018 ("3Q18"); (ii) commissions revenue increase of 4.8% to $180.4 million from $172.1 million for 3Q18; (iii) advisory fee revenue increase of 6.6% to $132.8 million from $124.6 million for 3Q18; (iv) investment banking revenue increase of 87.3% to $18.7 million from $10.0 million for 3Q18; (v) service fees revenue increase of 8.5% to $31.1 million from $28.7 million for 3Q18; (vi) net income attributable to the Company of $11.4 million, as compared to net income attributable to the Company of $9.4 million in 3Q18; (vii) net income available to common shareholders, after payment of preferred dividends, of $2.7 million or $0.02 per basic and diluted common share, as compared to net income available to common shareholders of $0.9 million or $0.00 per basic and diluted common share in 3Q18; (viii) EBITDA of $31.1 million, an increase of 22.8% from $25.3 million in 3Q18; (ix) total client assets under administration of $181.1 billion, a 3.2% increase from $175.5 billion at September 30, 2018; and (x) advisory assets under management of $90.4 billion at September 30, 2019, a 12.9% increase from $80.1 billion at September 30, 2018.

30.    In the 3Q19 press release, defendant Lampen was quoted as stating:

We are very pleased to report another quarter with continued robust growth in client assets as well as revenues and profitability. During the third quarter 2019, solid execution by our management team, together with stable equity markets, contributed to our strong performance. We remain focused on continuing our consistent growth with the support of our $248.8 million of shareholders' equity and over $250 million of cash and cash equivalents and creating value for all our employees, financial advisors and shareholders.

Defendant Malamed also trumpeted the Company's success, stating:

All segments of our businesses continued to perform well in the third quarter, with revenues of $374.5 million, a 7.4% increase from the prior year period, and a 22.8% increase in adjusted EBITDA, to $31.1 million. The continued growth of our nationwide network of approximately 4,400 independent financial advisors reflects

our successful recruiting efforts of talented advisors over the past three years. Total client assets grew to a record $181.1 billion and advisory assets under management increased to a record $90.4 billion, up 3.2% and 12.9%, respectively, on a year-over-year basis. Our strong performance validates the strengths of our ongoing strategic initiatives to add significant value to the businesses of financial advisors, especially with respect to aligning the intellectual capital, technology and growth platforms that are crucial to supporting the productivity and professional growth of financial advisors.

**The Sale Process**

31.     In February 2019, a party referred to in the Proxy Statement as "Party B", suggested to Company management a potential sale of the Company to Party B.  After updating the Board on this outreach, Company management asked Jefferies to assist the Company in its evaluation of a potential sale of the Company to Party B.

32.     On February 25, 2019, Party B signed a non-disclosure agreement with the Company.

33.     On March 26, 2019, Party B communicated to Company management that it was interested in acquiring all of the outstanding shares of common stock of the Company at a purchase price range of $4.75-$5.00 per share.  One week later, on April 2, 2019, Party B informed Company management and Jefferies that it was not prepared to proceed with an acquisition of the Company at that time, but that it may be interested in resuming discussions in the next several months.

34.     On April 23, 2019, the Board met and discussed the Company's strategic plans going forward and reviewed a management presentation which included new cost-savings initiatives to better position the Company given the changing industry dynamics.  Thereafter, Company management began implementing cost-cutting and other efficiency initiatives as discussed with the Board.

35.     In early July 2019, at the Board's request, management asked Jefferies to assist it in a preliminary evaluation of whether the Company should more broadly consider potential strategic alternatives, including a sale of the Company at that time.

36.     On July 8, 2019, the Board met and determined to (i) initiate a process for the consideration of potential strategic alternatives for the Company, including a potential sale of the Company; (ii) engage Jefferies to act as the Company's financial advisor in connection with the exploratory process; and (iii) establish a transaction committee of the Board ("Transaction Committee"), to oversee and manage the process on behalf of the Board and to provide regular updates to the Board regarding the status of the process.

37.     Between September 6, 2019 and the end of September 2019, Jefferies discussed with 19 parties interest in pursuing a potential transaction with the Company.  Fifteen parties signed non-disclosure agreements with the Company.

38.     On October 14, 2019, Advisor Group, Party B and two other parties, identified in the Proxy Statement as "Party C" and "Party D", submitted preliminary indications of interest for a strategic transaction involving the Company: Advisor Group at a purchase price of $3.75 per share; Party B at a purchase price of $2.50 per share; Party C at a purchase price range of $2.30-$2.60 per share; and Party D at a purchase price range of $2.30-$2.91 per share.

39.     Thereafter, on October 26, 2019, Advisor Group submitted a revised indication of interest, at a purchase price of $3.50 per share.

40.     On October 27, 2019, the Company entered into an exclusivity agreement with Advisor Group.

41.     On November 11, 2019, the Board met, Jefferies delivered its fairness opinion and the Board approved the Merger Agreement.

**The Proposed Transaction**

42.　　On November 11, 2019, Ladenburg and Advisor Group issued a joint press release

announcing the Proposed Transaction.  The press release states, in relevant part:

> PHOENIX, November 11, 2019 – Advisor Group, one of the nation's largest
> networks of independent wealth management firms, and Ladenburg Thalmann
> Financial Services Inc. (NYSE American: LTS, LTS PrA, LTSL, LTSF, LTSK,
> LTSH) ("Ladenburg"), a publicly-traded diversified financial services company,
> today announced that both companies have entered into a definitive merger
> agreement to join the two companies.
>
> Under the terms of the transaction, Ladenburg has agreed to be acquired by Advisor
> Group through a cash merger, in which each outstanding share of Ladenburg's
> common stock will be converted into a cash payment of $3.50 per share. The total
> enterprise value of the transaction is approximately $1.3 billion, taking into account
> Ladenburg's common stock, preferred stock and outstanding debt. The definitive
> merger agreement and the transactions contemplated were unanimously approved
> by Ladenburg's Board of Directors.
>
> The transaction, which is subject to customary closing conditions, including the
> approval of Ladenburg's shareholders, and receipt of required regulatory clearances
> and approvals, is expected to close in the first half of 2020.
>
> Following the completion of this transaction, the expanded Advisor Group
> organization will continue to be led by its current CEO and President, Jamie Price.
> When the transaction is completed, Advisor Group's leadership team will include
> senior executives from both Advisor Group and Ladenburg. Ladenburg's firms will
> not be merged with Advisor Group's firms, reflecting both companies'
> commitment to a multi-brand network model.
>
> Advisor Group's network of firms consists of FSC Securities Corporation, Royal
> Alliance Associates, SagePoint Financial and Woodbury Financial. Ladenburg's
> independent advisory and brokerage firms include Securities America, Triad
> Advisors, Investacorp, KMS Financial Services and Securities Service Network
> (SSN).
>
> Additional Ladenburg subsidiaries include Highland Capital Brokerage, a leading
> insurance solutions brokerage; Premier Trust, a financial advisor-focused trust
> services company; and Ladenburg Thalmann & Co., a middle market investment
> bank. Each of these subsidiaries has played a role in delivering unique, value-add
> solutions to Ladenburg-affiliated financial advisors.
>
> Ladenburg Thalmann Chairman, President and CEO Richard Lampen said, "This
> is a transaction that maximizes value for our shareholders, while positioning our
> financial advisors for continued growth and success. We have always been

impressed with Advisor Group's platform, offerings and leadership. Advisor Group's CEO, Jamie Price, and his management team offer a mature shared services model and a demonstrated ability to innovate and invest in ways that help advisors grow. We are confident this transaction will help our advisors accelerate the growth of their businesses, while enabling them to benefit from the highly personalized service experience they have always enjoyed, under a very similar multi-custodial, multi-clearing and multi-brand structure."

Advisor Group President and CEO Jamie Price said, "This acquisition brings together the best of two industry leaders, to the benefit of the financial advisors we collectively serve. We believe that the investments necessary for competitively differentiated technology, practice management, products and service excellence require a greater level of scale than either of our companies can achieve on a stand-alone basis.  In fact, as our two organizations learned more about each other's platforms, it became obvious that our strengths rounded out each other's offerings, and combined, we will have one of the most comprehensive and best-in-class platforms for financial advisors in the industry. Equally important, Advisor Group and Ladenburg have a shared commitment to the flexibility of third-party clearing, together with maintaining a 'small firm feel' delivered through the distinct management teams and cultures of a multi-brand network model. In today's fast-consolidating marketplace, where advisors fear becoming just another number in the crowd, the more intimate service culture and sense of community that our multi-brand approach offers is increasingly in demand."

Milton Berlinski, Co-Founder and Managing Partner of Reverence Capital Partners, a leading financial services-focused private equity firm and majority equity owner of Advisor Group, said, "Ladenburg Thalmann and Advisor Group are highly complementary businesses, with nationwide footprints, technology capabilities and senior management talent that represent the best of what the wealth management industry has to offer for financial advisors and their clients. By combining these two firms, we have created one of the most robust platforms in the country to support advisors' growth, with the scale, resources and intellectual capital to position them for success, no matter their business model or client focus."

<u>Giving Advisors the Best of the Best in Platforms, Tools and Expertise</u>

Following the completion of this transaction, Advisor Group will continue to operate under a multi-brand network model of firms, enabling the delivery of industry-leading tools and expertise through distinct firms with unique brands that each offer a sense of community and personalized service for affiliated financial advisors.

Financial advisors affiliated with Ladenburg's subsidiary firms are expected to benefit from Advisor Group's recent investments in cutting-edge enterprise-level service offerings, including eQuipt, the firm's fully-digital client onboarding system; MyCMO, its personalized advisor marketing platform;

MySuccessionPlan.com, its suite of bundled succession planning resources; and its integrated CyberGuard Program for cybersecurity.

For advisors affiliated with Advisor Group, the transaction brings access to Ladenburg Thalmann's industry-leading practice management capabilities, wealth management resources, advisor-client portal technologies and expanded national scale.

The two companies also feature strong cultural similarities, including a shared commitment to supporting greater diversity across the industry, including advancing career opportunities for women financial advisors and women executives, as evidenced by Advisor Group's Women Forward initiative and the Ladenburg Institute of Women & Finance.

<u>Multi-Custodial, Multi-Clearing Approach Minimizes Disruption and Maximizes Flexibility; Positions Company for Future Leadership in RIA Segment</u>

Upon the transaction's completion, Advisor Group will be one of the industry's leading providers of a multi-custodial, multi-clearing model that drives maximum choice and flexibility for financial advisors.

Because both Advisor Group and Ladenburg use Pershing and National Financial (part of Fidelity Custody & Clearing Solutions) as their largest clearing providers, no repapering of client accounts will be necessary in connection with this transaction and its closing.

As one of the largest multi-custodial and multi-clearing networks of firms in the country, the company will be even better positioned to redefine the RIA segment of the wealth management space. The combined company will be able to support all financial advisor business models, including the hybrid advisor doing both securities and advisory business, as well as the "investment advisor only" professional who is either utilizing a corporate RIA platform, or has an independent RIA.

Adam Malamed, Executive Vice President and Chief Operating Officer of Ladenburg, said, "The ongoing evolution of our industry validates the importance of Ladenburg and Advisor Group's respective roles as the leading innovators of the network model of firms approach within our industry. The appeal of bringing Ladenburg and Advisor Group together is driven in large part by our shared vision for driving a transformative and innovative approach to the wealth management space. For example, among the many advantages of our multi-custodial, multi-clearing capabilities are the expertise and leadership we can further build in the RIA space. The combination of Ladenburg and Advisor Group creates a unique offering for financial advisors who are primarily fee-based, or fee-only, whether they want to have their own RIA under a turnkey level of back and middle office support, or

would prefer to do fee-only work through a corporate RIA, without having to also hold securities licenses on the brokerage side of our industry."

**Insiders' Interests in the Proposed Transaction**

43.     Ladenburg insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.   The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Ladenburg.

44.     For example, under the terms of the Merger Agreement, Ladenburg directors and officers will receive cash payments for all Company stock options, whether vested or unvested, and restricted share unit awards – an opportunity that would not otherwise be available.

45.     Additionally, if they are terminated in connection with the Proposed Transaction, the Company's named executive officers stand to receive substantial severance benefits, as set forth in the following table:

Golden Parachute Compensation

| Named Executive Officers | Cash ($)[1] | Equity ($)[2] | Health and Welfare Continuation ($)[3] | Total ($) |
|---|---|---|---|---|
| Richard J. Lampen | $       4,200,000 | $       1,859,375 | $              — | $       6,059,375 |
| Mark Zeitchick | $       3,990,000 | $       1,859,375 | $         19,002 | $       5,868,377 |
| Adam Malamed | $       3,427,500 | $       1,203,125 | $         61,368 | $       4,691,993 |
| Brett H. Kaufman | $          925,000 | $          280,000 | $         59,120 | $       1,264,120 |
| Joseph Giovanniello | $          900,000 | $          280,000 | $         58,329 | $       1,238,329 |

46.     It also appears that certain Company insiders may have secured positions for themselves upon consummation of the Proposed Transaction.   The November 11, 2019 joint press release announcing the Proposed Transaction states "[w]hen the transaction is completed, Advisor Group's leadership team will include senior executives from both Advisor Group and Ladenburg."

**The Proxy Statement Contains Material Misstatements or Omissions**

47.     Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Ladenburg's stockholders.   The Proxy Statement misrepresents or

omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

48.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the sale process leading to the Proposed Transaction; (ii) Ladenburg management's projections, relied upon by Ladenburg's financial advisor, Jefferies, in its financial analyses; (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Jefferies; and (iv) potential conflicts of interest faced by Ladenburg insiders.

***Material Omissions Concerning the Background Process***

49.     The Proxy Statement fails to disclose or misstates material information regarding the background process leading up to the Proposed Transaction.

50.     For example, the Proxy Statement sets forth that in connection with the potential sale of Ladenburg, 15 parties signed non-disclosure agreements with the Company.   Proxy Statement at 29.   Critically, the Proxy Statement fails to expressly indicate whether the confidentiality agreements Ladenburg entered into with these 15 parties are still in effect and/or contain "don't-ask-don't-waive" ("DADW") standstill provisions that are presently precluding each of these potential buyers from making a topping bid for the Company.

51.     The disclosure of the terms of the confidentiality agreements is crucial to Ladenburg stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

52.     Whether the Board adopted preclusive measures that have shut out the most likely topping bidders for the Company must be disclosed to Ladenburg stockholders prior to their voting decision with respect to the Proposed Transaction.

53.     The Proxy Statement also fails to disclose the members of the Transaction Committee tasked with overseeing and managing the process on behalf of the Board and to provide regular updates to the Board regarding the status of the process.

54.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Ladenburg's Financial Projections***

55.     The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

56.     Specifically, the Proxy Statement omits material information regarding the Company's financial projections provided by Company management and relied upon by Jefferies for its analyses.

57.     For example, in connection with Jefferies' *Discounted Cash Flow Analysis* ("DCF"), the Proxy Statement sets forth:

> Jefferies performed a discounted cash flow analysis of the Company, using a terminal multiple approach, to calculate a range of implied present values of the unlevered, after-tax free cash flows that the Company was forecasted to generate through the full fiscal year ending December 31, 2023, utilizing the Management Projections . . .

*Id*. at 42.

58.     Similarly, in connection with Jefferies *Selected Public Companies Analysis* and *Selected Transactions Analysis*, the Proxy Statement sets forth that Jefferies utilized the Company's latest 12 months (as of June 30, 2019) run-rate adjusted EBITDA.

59.     The Proxy Statement fails, however, to disclose: (i) the unlevered, after-tax free cash flows ("UFCFs") that the Company was forecasted to generate through the full fiscal year

ending December 31, 2023 as used in Jefferies' DCF; (ii) the definition of how the Company's UFCFs were calculated; (iii) the line items underlying the Company's UFCFs; (iv) Ladenburg's latest 12 months (as of June 30, 2019) run-rate adjusted EBITDA; and (v) the line items used to calculate Adjusted EBITDA, including the full annualized impact of savings achieved as part of the Company's efficiency initiatives, the negative impact of interest rate cuts on the Company's cash sweep revenues, the annualized impact of net new advisors that joined the Company during the latest 12-month period (as of June 30, 2019), the impact of increased clearing business credits, and the impact of the Kestler acquisition.

60.     The omission of this information renders the statements in the "Certain Unaudited Company Forecasts" and "Opinion of the Company's Financial Advisor" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Jefferies' Financial Analyses***

61.     The Proxy Statement describes Jefferies' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Jefferies' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Ladenburg's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Jefferies' fairness opinion in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Ladenburg's stockholders.

62.     With respect to Jefferies' *Selected Public Companies Analysis*, the Proxy Statement fails to disclose: (i) the individual financial metrics for each of the companies observed by Jefferies; (ii) the Company's latest 12 months (as of June 30, 2019) run-rate adjusted EBITDA;

(iii) the Company's total debt as of October 31, 2019; and (iv) parent company cash as of October 31, 2019.

63.     With respect to Jefferies' *Selected Transactions Analysis*, the Proxy Statement fails to disclose: (i) the individual multiples for each of the transactions observed by Jefferies; (ii) the Company's latest 12 months (as of June 30, 2019) run-rate adjusted EBITDA; (iii) the Company's total debt as of October 31, 2019; and (iv) parent company cash as of October 31, 2019.

64.     With respect to Jefferies' *DCF*, the Proxy Statement fails to disclose: (i) the UFCFs that the Company was forecasted to generate through the full fiscal year ending December 31, 2023; (ii) the definition of how Ladenburg's UFCFs were calculated; and (iii) quantification of the inputs and assumptions underlying the discount rates ranging from 11.5% to 12.5%.

65.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Without such undisclosed information, Ladenburg stockholders cannot evaluate for themselves whether the financial analyses performed by Jefferies were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Jefferies' opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

66.     The omission of this information renders the statements in the "Opinion of the Company's Financial Advisor" and "Certain Unaudited Company Forecasts" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

67.     The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Ladenburg insiders.

68.     For example, the November 11, 2019 joint press release announcing the Proposed Transaction states "[w]hen the transaction is completed, Advisor Group's leadership team will include senior executives from both Advisor Group and Ladenburg."  Yet, the Proxy Statement fails to disclose the Ladenburg executives that have secured positions with the combined company. Additionally, the Proxy Statement fails to disclose the details of any employment and retention-related discussions and negotiations that occurred between Advisor Group and Ladenburg Board members and executive officers, including who participated in all such communications, when they occurred and their content.  Moreover, the Proxy Statement further fails to disclose whether any of Advisor Group's indications of interest mentioned management retention or consulting arrangements with the combined company or the purchase of or participation in the equity of the surviving corporation.

69.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

70.     The omission of this information renders the statements in the "Background of the Merger" and "Interests of the Company's Directors and Executive Officers in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act

71.     The Individual Defendants were aware of their duty to disclose this information

and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of Ladenburg will be unable to make a sufficiently informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**

**Claims Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

72.      Plaintiff repeats all previous allegations as if set forth in full.

73.      During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

74.      By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the sale process leading to the Proposed Transaction, Ladenburg management's projections, relied upon by Ladenburg's financial advisor, Jefferies, in its financial analyses, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Jefferies, and potential conflicts of interest faced by Ladenburg insiders.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

75.      The omissions and false and misleading statements in the Proxy Statement are

material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

76.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

77.     Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Claims Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act

78.     Plaintiff repeats all previous allegations as if set forth in full.

79.     The Individual Defendants acted as controlling persons of Ladenburg within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Ladenburg, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

80.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

82.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

83.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

84.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Ladenburg's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Ladenburg, and against defendants, as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Ladenburg

stockholders;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff;

C.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act,

as well as SEC Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for

Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  December 23, 2019                                WEISSLAW LLP

By
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010
Email: racocelli@weisslawllp.com

*Attorneys for Plaintiff*